UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
A.R. on behalf of F.P.,

               Plaintiff,

-against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

               Defendant.

-------------------------------------------------------X

12 CV 4493

JUDGE CROTTY

COMPLAINT



JUN 05 2012

U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

1.     A.R., on behalf of F.P., brings this action against Defendant New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§1400 et seq., to obtain a free appropriate public education.

2.     This action is brought to seek reversal of an unfavorable final state administrative decision dated March 19, 2012.

3.     A. R. seeks the direct payment of F. P.'s tuition in the amount of $44,500.00 for her appropriate placement in a non-public school during the 2010-11 school year.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action under the IDEA, 20 U.S.C. §1415(i)(2)(A), and 28 U.S.C. §§1331 and 1343.

5.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391(b)(1) as the judicial district in which the DOE has its principal offices.

## PARTIES

6.     Initials are used throughout this Complaint to preserve the confidentiality of the child, F.P., and her mother, A.R., in conformity with the privacy provisions of the IDEA, 20 U.S.C. §1417(c), the Federal Rules of Civil Procedure §5.2, and the Family Educational and Privacy Rights Act, 20 U.S.C. §1232g.

7.     F. P. is a disabled student with a classification of "Learning Disability." F.P. resides with her Mother, A.R., in New York City, which is within the DOE's jurisdiction.

8.     The DOE is a branch of the municipal government of New York City, which, in accordance with the IDEA and Article 89 of the New York State Education Law, is responsible for providing a free appropriate public education to those disabled children within its district who have been classified as being in need of special education services. The DOE, which has its principal administrative offices at 52 Chambers Street, New York, New York, is a "local educational agency" as that term is defined in 20 U.S.C. §1401(19).

## STATUTORY AND REGULATORY FRAMEWORK

### 1. IDEA

9.     In enacting the IDEA, Congress established a comprehensive statutory framework to enable states to provide disabled children between the ages of three and twenty-one with a free appropriate public education ("FAPE"). 20 U.S.C. §1400(d)(1)(A); 20 U.S.C. §1412(a)(1)(A).

10.     Any state receiving federal financial assistance under the IDEA must adhere to the IDEA's procedural requirements and substantive objectives. 20 U.S.C. §1412(a)(1)(A).

11.     In order to satisfy the requirements of the IDEA, a school district must provide each disabled child with "special education and related services that...have been provided at

public expense, under public supervision and direction, and without charge." 20 U.S.C. §1401(9).

12. "The term 'special education' means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability...." 20 U.S.C. §1401(29).

13. Each state's departments or boards of education are responsible for distributing IDEA funds to "local educational agencies," 20 U.S.C.§1411(e)(3)(C)(ii)(III), each of which must have in effect at the beginning of every school year a written Individualized Education Program ("IEP") for every disabled child. 20 U.S.C. §1414(d)(1)(A).

14. Each child's IEP must be reviewed at least once each year to determine its adequacy and the DOE must recommend an educational program for the next school year. 20 U.S.C. §1414(d)(4)(A)(i).

15. Each disabled child must have a valid IEP in effect at the beginning of each school year. 34 C.F.R. §300.324.

16. A parent dissatisfied with a proposed IEP may request an impartial due process hearing, 20 U.S.C. §1415(f)(1)(A), before an impartial hearing officer.

17. The request for an impartial due process hearing must be submitted not more than two years after the date the parent knew, or should have known, about the alleged action that forms the basis of the complaint. 20 U.S.C. §1415(f)(3)(C).

18. An impartial hearing officer's decision may be appealed to the state educational agency, 20 U.S.C. §1415(g)(1), after which the aggrieved party has the right to sue in either state or federal court. 20 U.S.C. §1415(i)(2)(A).

19. "If the parents of a child with a disability...enroll the child in a private elementary...or secondary school without the consent of or referral by the public agency, a court

or hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." 20 U.S.C. §1412(a)(10)(C)(ii).

20.     The amount of reimbursement "may be reduced or denied" if, either "at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency...including stating their concerns and their intent to enroll their child in a private school at public expense; or 10 business days...prior to the removal of the child...the parents did not give written notice to the public agency of the [foregoing] information...." (the "10-Day Notice"). 20 U.S.C. §1412(a)(10)(C)(iii)

21.     Reimbursement may also be reduced or denied if parents do not make their child available for evaluations by the local educational agency, or upon a "finding of unreasonableness with respect to the actions taken by the parent." 20 U.S.C. §1412(a)(10)(C)(iii)(II), (III).

22.     If an action is brought in federal court, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §1415(i)(2)(C)(i)-(iii).

**2. New York State Education Law**

23.     New York State (the "State") has enacted statutes and regulations, both procedural and substantive, governing the education of disabled children. New York State Education Law §§4401 et seq.; 8 NYCRR §§200 et seq.

24.     New York State Education Law (NYS Education Law) tracks the IDEA's requirements.

25.     The State has mandated that that disabled students be provided with appropriate special education necessary to meet their unique needs. NYS Education Law §4401(1); 8 NYCRR §§200.6(a)-200.6(a)(2).

26.     Students with disabilities include those classified as being Learning Disabled. 8 NYCRR§200.1(zz)(6).

27.     The State has also mandated that each board of education appoint committees on special education ("CSE") to ensure the timely evaluation and placement of students. NYS Education Law §4402(1)(b)(1); 8 NYCRR §§200.3(a).

28.     A CSE must develop an IEP for every disabled child residing in its district, which must be reviewed at least once each year. NYS Education Law §4402(1)(b)(1) & (2); 8 NYCRR§§200.4(d)(2), (f).

29.     "Related services" are defined as "developmental, corrective, and other supportive services as are required to assist a student with a disability and includes speech-language pathology...counseling...and other appropriate support services...." 8 NYCRR 200.1(qq)

## STATEMENT OF FACTS

### 1. Background

30.     F.P. was born in 1999.

31.     F.P. has serious receptive-expressive language and language processing issues, which have negatively impacted her overall academic and social/emotional development.

32.    By the time F.P. entered 2d grade, A.R. had become aware of F.P.'s learning difficulties and requested that the DOE undertake an evaluation of F.P.

33.    The DOE classified F.P. as Learning Disabled on her IEP for the 2007-08 school year.

34.    For the 2007-08 school year, F.P. attended a 3d grade general education class with daily small group supplementary instruction and after-school speech and language services.

35.    During that year, F.P. not only failed to make progress, but suffered regression due to failure to address her language and language processing issues, which not only affected her academic performance, but also contributed to her low self-esteem and increasing lack of confidence.

36.    Follow-up psychological and speech/language evaluations conducted in the summer of 2008 revealed deficits in F.P.'s receptive-expressive language, including word retrieval and phonological awareness, which impacted her ability to express herself, decode and comprehend written text and oral narrative.

37.    Despite F.P.'s regression, for the 2008-09 school year, the DOE recommended that F.P. receive the same services she had received the prior year, i.e., general education with small group supplementary instruction, and after-school speech and language services.

38.    Having considered alternative placements, including the Cooke Center for Learning and Development ("Cooke"), A.R. believed that Cooke would appropriately address F.P.'s unique academic and social/emotional needs, and enrolled F.P. at Cooke for the 2008-09 school year.

39.    Cooke is designed to service primarily students with speech/language, communication disorders and learning disabilities.

40.     Cooke provides small group instruction to target the needs of individual students for academic instruction and provides flexibility to address all the students' academic needs, including their adaptive and therapeutic needs.

41.     There is close collaboration between Cooke's service providers and teachers, including consultation with teachers outside the classroom, and "partnering" with the teacher in the classroom and in small instructional group settings.

42.     A.R. filed a Due Process Complaint to obtain DOE funding of F.P.'s 2008-09 tuition on the basis that the DOE had not offered F.P. a FAPE, that Cooke was an appropriate placement and that the equities supported her claim.

43.     No hearing was held as the DOE agreed to pay F.P.'s full tuition directly to Cooke for the 2008-09 school year.

44.     For the 2009-10 school year, the CSE recommended a 12:1 classroom with speech/language services, but as the assigned classroom had no space available, A.R. requested another placement; instead, the CSE sent her a copy of the same classroom assignment.

45.     A.R. thus re-enrolled F.P. at Cooke for the 2009-10 school year, and filed a due process complaint, which, again, the DOE settled by agreeing to pay F.P.'s tuition directly to Cooke.

### 2. Facts Pertaining to 2010-11 School Year

46.     On March 12, 2010, A.R. signed a "Cooke Center School Enrollment Contract 2010-2011 Academic Year" (the "Contract") to ensure F.P. an appropriate placement for the 2010-11 school year, in the event the DOE did not offer an appropriate public school placement.

47.     The Contract, which did not require any deposit to be paid upon signing, expressly provided that A.R. was responsible for payment of the full tuition by September 30,

2010, but that if A.R. pursued her due process rights to seek funding from the DOE, Cooke agreed to delay payment.

48. Under the Contract, the only grounds for release from the continuing responsibility for tuition payment without financial penalty was A.R.'s acceptance of a DOE-recommended school placement and notification to Cooke in writing of F.P.'s withdrawal from Cooke by October 31, 2010; withdrawal to accept a DOE-recommended placement after October 31, 2010, would result in A.R. being responsible for a pro-rated tuition based upon the number of months that F.P. actually attended Cooke.

49. The Contract provided that Cooke's failure to enforce or exercise, at any time, any right arising under the Contract "does not constitute, and shall not be construed as, a waiver of such a term or right and shall in no way affect [Cooke's] right to later enforce or exercise such term or right."

50. On May 24, 2010, A. R. attended a CSE meeting held to prepare F.P.'s IEP for the 2010-11 school year.

51. A.R. was fully cooperative with the CSE at the May 24, 2010 IEP meeting.

52. During the meeting, there was no discussion of a specific program for F.P., e.g., number of students in the classroom, student/teacher ratio, only that F.P. should remain in a special class and her Learning Disability classification continued.

53. A.R. subsequently received a completed copy of the IEP by mail, recommending the same 12:1 classroom and speech/language services as recommended in the 2009-10 IEP.

54. On August 24, 2010, counsel, on behalf of A.R., sent a timely 10-Day Notice to the DOE advising that it had failed to offer F.P. a placement for the 2010-11 school year, and that she planned to re-enroll F.P. at Cooke and seek funding of the tuition from the DOE.

55.    On August 27, 2010, after receiving a Final Notice of Recommendation ("FNR") for a 12:1 classroom at J.H.S. 131 in the Bronx, counsel notified the DOE in writing that the school was closed, that A.R. would visit after it re-opened in September, and that pending same, A.R. planned to re-enroll F.P. at Cooke for the 2011-11 school year and seek DOE funding.

56.    During her visit to J.H.S. 131 on October 1, 2010, A.R.'s fears were confirmed that the placement would not be appropriate for F.P., and, by letter from counsel dated October 5, 2010, advised the DOE why the placement was not appropriate for F.P., and her intention to seek an impartial hearing to obtain DOE funding of F.P.'s tuition at Cooke for the 2010-11 school year.

57.    After A.R.'s filing of a timely 10-Day Notice and subsequent notifications, the DOE did not offer F.P. an alternative placement.

58.    A.R. did not hinder the DOE's efforts to provide F.P. with a FAPE or otherwise frustrate the placement process for the 2010-11 school year, but cooperated fully throughout the process.

## ADMINISTRATIVE HEARINGS

### 1. Impartial Hearing

59.    On August 12, 2011, A.R. filed a Due Process Complaint on behalf of F.P., requesting an impartial hearing to obtain direct DOE funding of F.P.'s 2010-11 Cooke tuition on the grounds that the recommended placement was not reasonably calculated to meet F.P.'s unique needs and thus failed to provide her with a FAPE, that Cooke was an appropriate placement, and that the equities supported A.R.'s claim.

60.    The impartial hearing was held on November 9, 2011.

61.     A.R. presented three witnesses (including herself) and entered fourteen documents into evidence; the DOE presented no witnesses and entered no exhibits into evidence.

62.     Because A.R. does not speak or understand spoken English, she testified through a Spanish-language interpreter assigned to her by the Impartial Hearing Office.

63.     At the hearing, the DOE conceded that it had failed to offer F.P. a FAPE for the 2010-11 school year.

64.     The DOE made no arguments concerning whether it believed Cooke was an appropriate placement.  Decision at 2.

65.     The DOE made no arguments concerning whether the equities supported A.R.'s claim. Id.

66.     The impartial hearing officer ("IHO") stated that although the DOE had agreed to submit a written closing statement, it chose not to do so and thus never expressed a clear position on the appropriateness of Cooke or the equities. Id.

67.     At the Impartial Hearing, witnesses for A.R. testified that Cooke is composed of mixed grade, mixed age level groups based on academic needs.

68.     Cooke tailors its programs to address the unique needs of each child by placing them in groups of 2-4 for academics based on their language and literacy skill levels.

69.     Although a particular topic of instruction for F.P. could be tied to 7th or even 8th grade state standards, it was not taught at those levels, but substantially modified and differentiated to meet the levels of F.P. and all the other students in her group.

70.     For the 2010-11 school year, F.P. was in a classroom consisting of a head teacher, two assistants and 8 other students grouped on the basis of their similar literacy and

comprehension levels, which was then further broken down into smaller groups for academic instruction.

71.     During the 2010-11 school year, F.P. improved nearly one grade level in decoding, her weakest area, and also made improvement in her expressive skills, self-esteem, confidence and ability to interact with her peers.

72.     The IHO determined that A.R. had not carried her burden to establish that Cooke was an appropriate placement for F.P.

73.     She based this determination on her finding that there was no evidence establishing that F. P. was ready for "curricular content that is more advanced than her age and grade level," and that in decoding, "her greatest area of deficit...[s]he began ...decoding on an early second grade level and ended the year decoding on a late second grade level...[making] less than a year's progress in decoding in a year." Decision at 11.

74.     Having found that A.R. did not carry her burden on the second prong of the *Burlington/Carter* analysis, the IHO acknowledged that she "[did] not have to consider equity." Id.

75.     Nevertheless, the IHO went on to decide that the equities did not favor A.R. based upon her finding that A.R. "failed to establish that she lacked the financial resources to pay...tuition costs at the Cooke Center for the 2010-11 school year as she did not provide any financial documents in this impartial hearing." Id. at 12.

76.     Disregarding the fact that the DOE had settled A.R.'s funding claims for each of the previous two years by direct payment of the full amount of F.P.'s tuition at Cooke, the IHO stated that A.R. "admits that she did not pay any private school tuition for two years and that she expected that she would not pay any...for the 2010-11 school year" in concluding that "there is

no evidence that the Mother ever seriously considered sending [ F.P.] to a public placement rather than continuing to send her daughter to the private school for free." Id.

77.     A.R. attended the CSE meeting and cooperated with the CSE's preparation of F.P.'s IEP; she visited the DOE's recommended placement and gave the DOE timely notice of her concerns with the placement, her intention to re-enroll F.P. at Cooke for the 2010-11 school year, and her intention to request DOE funding of the tuition; A.R. took all necessary and appropriate action to secure direct DOE funding under the terms of the Contract.

78.     The IHO's decision regarding the appropriateness of Cooke and the equities was neither thorough nor careful.

### 2. Appeal to State Review Office

79.  On January 4, 2012, A.R., on behalf of F.P., appealed the IHO's Decision to the State Review Officer (the "SRO") by timely filing a Verified Petition (the "Petition").

80.     In her Petition, A.R. appealed the IHO's finding that Cooke was not an appropriate placement for F.P. and that the equities did not favor her claim for tuition.

81.     The SRO issued his decision on March 19, 2012 (the "SRO Decision")

82.     The SRO determined that the IHO erred in concluding that Cooke was not an appropriate placement and reversed the IHO's Decision on that issue.  SRO Decision at 7, 13.

83.     The SRO left in place the IHO's decision that equitable considerations did not support A.R.'s claim, based principally on his finding of insufficient evidence that A.R. was "legally obligated" to pay the tuition at Cooke. Id. at 15.

84.     In a footnote, without any legal analysis of his own, the SRO wrote that he had not found any basis in the hearing record to overturn the IHO's finding that "…there was no

evidence that the parent 'ever seriously considered sending [F.P.] to a public placement' for the 2010-11 school year rather than continuing to send her to a private school." Id.

85.     The SRO made no attempt to balance the equities.

86.     In fact, the SRO omitted any reference to equitable factors favoring A.R., including her attendance and participation at the CSE meeting; her cooperation in the preparation of F.P.'s IEP; her visit to the DOE's recommended placement; her timely notice to the DOE as to why she believed the placement was not appropriate for F.P., her intention to re-enroll F.P. at Cooke for the 2010-11 school year and seek direct funding from the DOE for the tuition.

87.     The SRO did not make any finding that A.R. interfered with, or otherwise obstructed, the placement process.

88.     A.R. was entirely cooperative throughout the placement process, and did nothing to frustrate the DOE's ability to provide F.P. with an appropriate placement.

89.     The SRO found "no reason to disbelieve [A.R.'s] statements" regarding her lack of financial resources. Id. At 16.

90.     Nonetheless, he stated that "the evidence that was submitted leaves out some information" including support obligations of F.P.'s father, if any, his income and financial resources, and financial documentation to support A.R.'s testimony. Id. at n.15.

91.     The SRO Decision on the equities was neither thorough nor careful.

92.     The SRO Decision on the equities was incorrect as a matter of law as the issue of parental resources is irrelevant to the IDEA's guarantee of a disabled child's right to receive a FAPE.

93.     The SRO Decision on the equities was incorrect as a matter of law because the IDEA provides for placement of a disabled child in a private school at public expense

irrespective of parents' economic circumstances, where an IEP fails to provide a FAPE, the private placement chosen by the parent is appropriate and the equities support the parent.

94. The issue of the family's economic circumstances is relevant only to a determination of the form of the remedy, i.e., retroactive reimbursement where a parent has already paid tuition, or direct payment to the school where a parent is unable to afford the tuition.

95 The SRO Decision on the equities was incorrect as a matter of law insofar as it labeled A.R.'s Contract with Cooke a "sham," as the Contract was complete, clear and unambiguous in placing the financial obligation for the tuition on A.R., with the express understanding that Cooke would permit payment owed under the Contract to be delayed in the event that A.R. pursued her due process rights to seek direct or "prospective" tuition funding from the DOE as she, in fact, did.

96. The SRO's Decision on the equities was wrong as a matter of law as the goal of the IDEA is to give disabled children both an appropriate education and a free one, and it should not be interpreted, as it was in the instant situation, so as to defeat one or the other of those objectives.

## FIRST CAUSE OF ACTION

97. By failing to offer or provide a free appropriate public education for F.P., Defendant DOE violated Plaintiff's rights under 20 U.S.C. §§1412(a)(1)(A), 1412(a)(10)(C)(ii).

## SECOND CAUSE OF ACTION

98. By failing and refusing to allow Plaintiff's claim for direct payment of F.P.'s tuition costs to enable her to attend Cooke, an appropriate non-public school, on the basis that she did not establish her inability to pay the tuition at Cooke for the 2010-11 school year, Defendant DOE violated Plaintiff's rights under 20 U.S.C.§1412(a)(10)(C)(ii).

## THIRD CAUSE OF ACTION

99. By failing and refusing to allow Plaintiff's claim for direct payment of F.P.'s tuition costs to enable her to attend Cooke, an appropriate non-public school, on the basis of its failure to balance the equities, Defendant DOE violated Plaintiff's rights under §§1412(a)(1)(A), 1412(a)(10)(C)(ii).

## FOURTH CAUSE OF ACTION

100. By failing and refusing to allow Plaintiff's claim for direct payment of F.P.'s tuition to enable her to attend Cooke, an appropriate non-public school, on the basis that she was not legally obligated to pay the tuition under the Contract, Defendant DOE violated Plaintiff's rights under 20 U.S.C. §1412(a)(10)(C)(ii).

## FIFTH CAUSE OF ACTION

101. By failing and refusing to allow Plaintiff's claim for direct payment of F.P.'s tuition to enable her to attend Cooke, an appropriate non-public school, by denying that A.R. was liable under the Contract based upon a misreading and misinterpretation of its clear and unambiguous terms, Defendant DOE violated Plaintiff's rights under 20 U.S.C. §§1412(a)(1)(A), 1412(a)(10)(C)(ii).

## CLAIMS FOR RELIEF

102. WHEREFORE, Plaintiff, F.P., respectfully requests that this Court:

1. Assume jurisdiction over this action;

2. Conduct an independent review of the administrative record;

3. Consider additional evidence concerning A.R.'s financial resources for purposes of considering the appropriate remedy;

4. Reverse the SRO's Decision finding that A.R.'s resources are relevant to a determination of the equities;

5. Reverse the SRO's Decision finding that under the terms of the Contract, A.R. was not legally obligated to pay F.P.'s tuition at Cooke;

6. Reverse the SRO's Decision that the equities do not support A.R.'s claim for direct payment of F.P.'s tuition costs to enable her to attend Cooke, an appropriate non-public school;

7. Enter a declaratory judgment finding that equitable considerations require an award of $44,500.00, equal to the amount of the 2010-11 school year tuition at Cooke;

8. Enjoin Defendant DOE to pay Cooke directly for the cost of tuition;

9. Award Plaintiff reasonable attorney's fees pursuant to 20 U.S.C. §1415(i)(3)(B)(i)(I) of the IDEA; and

10. Grant such other, further and different relief as the Court deems just and proper.


Dated: New York, New York
       June 8, 2012



                                        _____
                                        YISROEL SCHULMAN (YS 3107)
                                        NEW YORK LEGAL ASSISTANCE GROUP
                                        Phyllis Brochstein (PB 6853)
                                        7 Hanover Square, 18th Floor
                                        New York, NY 10004
                                        (212) 613-5041

                                        Attorneys for Plaintiff